UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

_____
                                            )
WILLIAM F. TIGHE,                           )
                                            )
             Plaintiff,                     )
                                            )   Civil Action No. 13-11399-DJC
      v.                                    )
                                            )
CAROLYN COLVIN, Acting Commissioner,[1]     )
Social Security Administration,             )
                                            )
             Defendant.                     )
_____ )

## MEMORANDUM AND ORDER

**CASPER, J.**                                                   August 14, 2014

### I.    Introduction

Plaintiff William F. Tighe ("Tighe") filed claims for Social Security Disability Insurance ("SSDI") and supplemental security income ("SSI") with the Social Security Administration ("SSA") on October 28, 2010. R. 180-192.[2] Pursuant to the procedures set forth in the Social Security Act, 42 U.S.C. §§ 405(g), 1383(c)(3), Tighe brings this action for judicial review of the final decision of the SSA Commissioner ("the Commissioner"), issued by an Administrative Law Judge ("ALJ") on June 25, 2012, denying his claim in part. R. 79-92. Before the Court are Tighe's motion for judgment on the pleadings to reverse in part the ALJ's decision, D. 11, and the Defendant's motion to affirm, D.12. For the reasons explained below, the Court DENIES Tighe's motion for judgment on the pleadings and ALLOWS the Commissioner's motion to affirm.

---

[1]The Court has substituted Carolyn Colvin, the Acting Commissioner of the SSA, as the Defendant pursuant to Fed. R. Civ. P. 25(d).

[2]Citations to "R." refer to the administrative record, D. 10.

<mark>1</mark>

**II. Factual Background**

Tighe was 44 years old when he ceased working on March 1, 2007. R. 180, 184. He had previously worked as a technician who tested and calibrated heat imaging cameras, as a senior assembler who tested chemistry makeup in fluids, as a missiles technician and as a tester on DNA boards. R. 33-39. In between periods of technical work, he owned and operated a cab business, found temporary technician work, worked as a janitor and, over a period of years, bought and sold five houses. Id.

Tighe filed claims for SSDI and SSI on October 28, 2010, asserting that he was unable to work as of March 1, 2007 due to visual impairment, diabetes, shoulder and back problems, depression and anxiety. R. 180-192, 232.

**III. Procedural Background**

Tighe filed applications for SSDI and SSI on October 28, 2010. R. 180. The SSA initially denied Tighe's claims on April 6, 2011, R. 99-104, and again upon reconsideration on July 28, 2011. R. 108-113. Tighe requested a hearing before an ALJ, which was held on June 7, 2012. R. 19-66. In a written decision dated June 25, 2012, the ALJ found, in a partially favorable decision to the claimant, that Tighe was disabled as of April 20, 2011. R. 75-92. Therefore, the ALJ concluded that with regard to Tighe's application for SSI that Tighe had been disabled since April 20, 2011. R. 91-92. However, the ALJ determined that Tighe was not entitled to a period of SSDI based on his application filed on October 28, 2010. Id.

Tighe requested a review of the ALJ's decision by the Appeals Council and the request was denied on January 25, 2013. R. 1-3. Accordingly, the ALJ's decision is the final decision of the Commissioner. R. 1.

**IV. Discussion**

**A.     Legal Standards**

*1.     Entitlement to Disability Benefits and SSI*

A claimant's entitlement to SSDI and SSI turns on whether he has a "disability," which is defined in this context as an "inability to do any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or has lasted or can be expected to last for a continuous period of no less than twelve months." 42 U.S.C. §§ 406(i), 423(d)(1)(A); 20 C.F.R. § 404.1505. The inability must be severe, rendering the claimant unable to do any of his previous work or any other substantial gainful activity which exists in the national economy. 42 U.S.C. § 423(d)(2); 20 C.F.R. §§ 404.1505-404.1511.

The Commissioner must follow a five-step process to determine whether an individual has a disability, and, thus, whether that individual's application for benefits will be granted. 20 C.F.R. § 416.920. All five steps are applied to every applicant; the determination may be concluded at any step along the process. Id. First, if the applicant is engaged in substantial gainful work activity, then the application is denied. Id. Second, if the applicant does not have or has not had within the relevant time period, a severe impairment or combination of impairments, then the application is denied. Id. Third, if the impairment meets the condition for one of the "listed" impairments in the Social Security regulations, then the application is granted. Id. Fourth, where the impairment does not meet the conditions of one of the "listed" impairments, if the applicant's "residual functional capacity" ("RFC") is such that he can still perform past relevant work, then the application is denied. Id. Fifth, and finally, if the applicant, given his RFC, education, work experience and age is unable to do any other work, the application is granted. Id.

*2. Standard of Review*

The Court may affirm, modify or reverse a decision of the Commissioner upon review of the pleadings and record. 42 U.S.C. § 405(g). Such review, however, is "limited to determining whether the ALJ used the proper legal standards and found facts upon the proper quantum of evidence." Ward v. Comm'r of Soc. Sec., 211 F.3d 652, 655 (1st Cir. 2000) (citing Nguyen v. Chater, 172 F.3d 31, 35 (1st Cir. 1999)). The ALJ's findings of fact are conclusive when supported by substantial evidence. 42 U.S.C. § 405(g). Substantial evidence exists "if a reasonable mind, reviewing the evidence in the record as a whole, could accept it as adequate to support [the Commissioner's] conclusion." Rodriguez v. Sec'y of Health & Human Servs., 647 F.2d 218, 222 (1st Cir. 1981). Thus, the reviewing Court must adhere to the ALJ's findings "even if the record arguably could justify a different conclusion, so long as it is supported by substantial evidence." Whitzel v. Astrue, 792 F. Supp. 2d 143, 148 (D. Mass. 2011) (citing Rodriguez Pagan v. Sec'y of Health and Human Servs., 819 F.2d 1, 3 (1st Cir. 1987)).

However, the ALJ's findings of fact "are not conclusive when derived by ignoring evidence, misapplying the law, or judging matters entrusted to experts." Nguyen, 172 F.3d at 35 (citations omitted). Thus, if the ALJ made a legal or factual error, the Court may reverse or remand such decision to consider new material evidence or to apply the correct legal standard. Manso-Pizarro v. Sec'y of Health & Human Servs., 76 F.3d 15, 16 (1st Cir. 1996) (citation omitted); see 42 U.S.C. 405(g).

**B.     Before the ALJ**

The Court limits its recitation of the facts to those facts relevant to its limited review of the portions of the ALJ's decision that Tighe asserts were made in error, namely, in regard to the onset date of his shoulder and mental impairments.

*1. Relevant Medical History*

    i.  Shoulder Impairments

On August 21, 2006, Tighe met with Dr. Lawrence P. Johnson for "evaluation of several months of right shoulder pain." R. 307. Dr. Johnson noted that Tighe reported falling the week prior which "seemed to aggravate the pain." Id. Dr. Johnson concluded that Tighe had "probable" subacromial bursitis and suggested active shoulder exercises and over-the-counter pain medication. Id. Tighe visited Dr. Johnson twice more in October 2006 and by October 23, 2006, Dr. Johnson noted that the shoulder pain had improved and "appear[ed] less likely to be adhesive capsulitis." R. 305.

In a subsequent visit with Dr. Johnson on March 16, 2007, Tighe reported falling again two weeks prior to the visit. R. 304. X-rays showed no fracture, but Tighe reported pain and stiffness in his scapula and shoulder. Id.

On January 18, 2008, Tighe met with Dr. Jack Chang and reported that he was experiencing pain in his shoulders which had lasted six weeks. R. 635. After that visit, Chang diagnosed Tighe with a frozen shoulder. Id.

On July 9, 2008, Tighe met with Dr. Eric Holstein, who found that Tighe's shoulder had no asymmetry, deformity, atrophy, instability, or tenderness, but had discomfort with elevation. R. 313. Dr. Holstein noted that Tighe had adhesive capsulitis and shoulder bursitis, prescribed Clinoril and referred Tighe to physical therapy. Id. After a follow-up visit on August 13, 2008, Dr. Holstein noted that Tighe's bilateral shoulder adhesive capsulitis had further improved. R. 312. On September 10, 2008, Dr. Holstein noted that Tighe's bilateral adhesive capsulitis had improved in his right shoulder but not the left, and that Tighe would continue with his medication regime which would now include Skelaxin. R. 311. Dr. Holstein noted that an MRI

of Tighe's left shoulder would be taken. Id. On September 17, 2008, Tighe reported to Dr. Holstein that he continued to have more shoulder pain in his left shoulder than in his right shoulder. R. 310. His MRI showed a rotator cuff tendinopathy. Id.

On October 15, 2008, Dr. Holstein noted that Tighe no longer had pain but still a decreased range of motion. R. 309. On November 19, 2008, Dr. Holstein reported that Tighe's bilateral shoulder adhesive capsulitis had improved and that he would continue his home exercise program but would no longer take Clinoril. R. 314. Dr. Holstein also noted that Tighe had "been able to do all activities" and had "recently finished a porch." Id. Tighe did not show up for his follow-up appointment scheduled for January 14, 2009. Id.

The record shows no further treatment for or evaluation of Tighe's shoulder impairments until March 28, 2011, when Tighe visited Dr. Joel Epstein for a consult. R. 427. Dr. Epstein reported that Tighe had mild diffuse pain when attempting abduction further than 30 degrees in his right shoulder and 20 degrees in his left shoulder. R. 428. On April 20, 2011, Dr. Holstein again examined Tighe and concluded that his shoulders had "severely limited active and passive range of motion." R. 475. Further, x-ray results showed an osteophyte formation on his left humerus. R. 476. Dr. Holstein prescribed Tighe with Clinoril and referred him to return to physical therapy. Id.

    ii.  Mental Impairments

On April 25, 2008, Tighe received an initial psychiatric assessment at Seven Hills Behavioral Health Center. R. 330-338. Dr. Ricardo Dancel, a psychiatrist, recorded Tighe's symptoms as depressed mood, sleep disturbance, low energy, poor concentration, agitation, restlessness, mood swings, irritability, anxiety, compulsions and anhedonia, promoted by work-related stress. R. 330. Dr. Dancel prescribed Tighe with two anti-depressants. R. 337.

6

Following the initial consultation on May 8, 2008, Tighe reported to the professionals at Seven Hills Behavioral Center that he was more depressed. R. 384. On May 22, 2008, Tighe reported that his depression had not improved and his anxiety was "to the roof." R. 385. Tighe, however, declined to join a depression group because he felt the other group members were much "sicker." R. 398. Tighe saw Licensed Independent Clinical Social Worker ("LICSW"), Normand Gingras ("Gingras") and Dr. Dancel consistently through the remainder of 2008, R. 376-383, 389, 393-398, and in November 2008 reported that he was "feeling better" and had finished a "major project" at his mother's house. R. 394. In December 2008, Gingras noted Tighe's "positive attitude" and that he would not "allow depression to overtake him." Id.

Tighe continued to see Dr. Dancel in 2009. R. 365-375. Dr. Dancel's records indicate that Tighe was prescribed additional medication. R. 367. On December 15, 2009, Dr. Dancel noted that Tighe's mood was stable. R. 365. On February 9, 2010, however, Gingras recorded that Tighe reported "feeling more depressed" as a result of losing his court case against his former employer and that he was considering applying for disability benefits while looking for work, but that he still wanted "to engage in some type of work to maintain his sanity." R. 321. In Gingras's next assessment, dated April 13, 2010, he reported Tighe's mental state as similar in that he was still depressed and anxious, but he also wanted to find a job because he "want[ed] to be a productive member of society." Id. On June 8, 2010, Gingras noted that Tighe would consider filing for disability if he did not get a job and was experiencing less anxiety than he did during his last appointment. Id. He also noted that Tighe planned to spend his summer "fixing up the house for his mother." Id. On August 27, 2010, Gingras recorded that Tighe was still bitter about being wrongfully fired from his last job and was "having difficulty developing other goals for himself." R. 322. His anxiety increased in September 2010 and he experienced

difficulty sleeping. Id. On November 19, 2010, Dr. Dancel noted that Tighe's mood was stable. R. 328.

On January 19, 2011, Tighe reported that he wanted to discontinue his therapy appointments with Gingras because the therapy reminded him of certain events. R. 710. Dr. Dancel also noted that Tighe enjoyed spending the Christmas holiday with his family, but still had trouble with dwelling on the past. Id. On March 24, 2011, Dr. Dancel recorded Tighe's reports that he was sleeping better, eating better and had a "much better" mood. R. 724. In Dr. Dancel's notes dated April 21, 2011, he stated that Tighe was still dealing with anxiety. R. 725.

On May 19, 2011, Tighe appeared to become depressed again, as noted by Dr. Dancel. R. 725. Tighe resumed therapy with Gingras on June 15, 2011. R. 673-74. Tighe reported to Gingras that he was spending whole days in bed and was feeling depressed again on August 18, 2011. R. 675-676. On August 24, 2011, Tighe's mental state was very unstable, and thus, he went to a mental health facility, where a provider determined that he was hostile, irritable and had obsessional thoughts. R. 531. Tighe's depression and anxiety continued to increase the following month, and he was admitted to a mental health facility on September 26, 2011 for an evaluation. R. 486.

### 2. ALJ Hearing

At the June 7, 2012 administrative hearing, the ALJ heard testimony from two witnesses, Tighe and vocational expert ("VE") James F. Scorzelli. R. 19-20. Tighe testified that he completed high school, which offered vocational training, that he had no hobbies and stayed in his home regularly. R. 29-30. When asked by the ALJ what he did while he was home, Tighe responded that he surfed the web and occasionally checked his e-mail and phone calls. Id. He described his mother as his main support and stated that he received food stamps. R. 30-31.

Tighe explained that his disability began on March 1, 2007, because after he lost his job he "went into depression." R. 31-32. Prior to his termination, he worked as a technician on heat and imaging cameras at BAE Systems. R. 33, 31-32. He explained that his coworkers picked on him, adding to his stress and depression. R. 32. Although his employers suggested he "start over as a new employee," Tighe testified that he felt that his depression was so severe that he could not go back to work. Id. He tried to sue the company for wrongful firing, but was unsuccessful. Id. Tighe did not apply for or receive unemployment benefits or workers compensation at that time. R. 32. Upon further questioning, the ALJ found that Tighe still received earnings from back holiday and sick pay after ending his job. R. 33. The ALJ also confirmed all of Tighe's past employment positions. R. 31-39.

When asked by the ALJ to elaborate why he believed he was incapable of working due to his depression, he explained that his depression kept him at home for days and sometimes weeks and thus, he could no longer work. R. 39-40. Tighe also cited anxiety and other physical impairments as ailments that prevented him from working. R. 40. Tighe testified that he was completely blind in his right eye and wore glasses, and thus, he could only drive in daylight. R. 40. He also testified that he had no depth perception, and his left eye had 20/20 vision while the right had 20/200. R. 41.

Tighe then explained the problems related to his shoulder. R. 41. He testified that he had shoulder surgery on both shoulders, rotator cuff problems, did not have a full range of motion and had completed physical therapy. R. 41-42.

Tighe then testified that due to his depression he did not want to get out of bed, had no energy and was very tired. R. 43. He explained that when he was able to get out of bed and went into public, he was afraid of the crowds around him and felt anxiety. Id. In the past five

years, on average, he spent five out of seven days at home.  Id.  He also testified that he suffered from anxiety attacks, which commenced when he felt like people were staring at him and occurred every day lasting from one minute to an hour.  R. 44.  Tighe stated that to help combat his feelings of anxiety, he took Xanax, which only helped a little.  Id.  He explained that a better solution to relieving his anxiety would be to remove himself from crowds.  Id.  Tighe also stated that he had been taking a generic version of Effexor, Abilify, and Doxepiin for his depression for the length of five years with only minimal results.  Id.  Tighe then described his experience with counseling.  R. 45.  He testified that seeing both a psychiatrist and therapist twice a month helped with his depression.  R. 45-46.

When the ALJ questioned him about what a typical week/day was like, Tighe responded that on a bad day, he would stay home all day and mostly lie in bed.  R. 46-47.  On a good day, which was usually twice a week, he would ride to the grocery store and visit his mother.  Id.  While at home, he would have coffee, watch the news, channel surf, web surf and then get ready to leave the house.  R. 48.  He also testified that he had difficulty sleeping and claimed that he usually could not fall asleep before 2:00 a.m.  R. 49.  Tighe also stated that he did laundry and took out the trash once a week and would prepare his meals using a microwave.  R. 50.  When the ALJ asked about whether he had friends, Tighe replied that he had one who tried to get him out of the house.  R. 51.  Tighe revealed that he smoked a pack of cigarettes a day and stopped drinking alcohol after he was arrested for drinking and driving in 1997.  R. 51-52.

Tighe then described his hospital stay in August 2011.  R. 52.  He testified that he was hospitalized for a week due to depression and had his medications adjusted a few times.  R. 52.  Following his stay, he participated in an aftercare program where he took "part in group discussions, for six hours a day."  R. 53.  The program was about seven to ten days long, which

was all his insurance would cover. Id. Although he explained that he found the program helpful, his progress lasted only for a short while before he "went back to the same old." Id. Tighe also testified that he did not feel comfortable in a crowd of people. R. 54. He explained that when he went to the store he believed that people were looking at him and talking about him. Id. He also stated that his ability to concentrate was not good, but that he was able to read and write. Id.

The ALJ asked Tighe how much he was required to lift at his previous jobs, to which Tighe answered one to three pounds. R. 56. The VE then described the different skill levels associated with Tighe's past jobs. R. 58-59. The ALJ asked the VE whether a person with age, education and work experience similar to Tighe, who was able to perform light exertional work, with Tighe's physical limitations and with only occasional interaction with co-workers could perform Tighe's prior work. R. 59-60. The VE answered no, R. 60, but stated that Tighe could work as a paper cutter, a binder, light housekeeper, optical goods polisher or touch-up screener. R. 60-62. The ALJ then asked the VE whether an individual with the same impairments, but who also had moderately severe limitations in the ability to accept instructions and to concentrate could perform Tighe's prior work. R. 62. The VE answered that a person who had "difficulty concentrating, persisting and maintaining pace" would be unemployable. R. 62-63. In response to a question by Tighe's attorney, the VE responded that a person who needed a daily two-hour nap would also be unemployable. Id.

### 3. *Findings of the ALJ*

Following the five-step process, 20 C.F.R. § 416.920, at step one, the ALJ found that Tighe was not engaged in substantial gainful activity and had not been since March 1, 2007. R. 81. At step two, the ALJ found that Tighe had several severe impairments, specifically obesity, right eye visual acuity, bilateral shoulder adhesive capsulitis, depression and anxiety. R. 81-82.

At step three, the ALJ determined that Tighe did not have an impairment or a combination of impairments that met one of the listed impairments in the Social Security regulations. D. 82. At step four, the ALJ found that, before and after April 20, 2011, Tighe had a RFC to perform light work and that he is limited to occasional balancing, stooping, kneeling, crouching and crawling. D. 84, 88. The ALJ added that Tighe must not perform any bilateral overhead reaching and that Tighe's work is limited to simple, routine and repetitive tasks with regular work breaks in an eight-hour work day. Id. Tighe's work is restricted to fields that require no interaction with the general public and only limited interaction with coworkers. Id. Tighe is further limited to occupations that do not require extensive reading or night driving. Id. On the basis of this finding, the ALJ determined that Tighe has been unable to perform past relevant work since March 1, 2007. R. 89. Tighe does not challenge any of those findings.

Finally, at step five, the ALJ found that, considering Tighe's age, education, work experience and RFC, there were no reasonably available jobs that Tighe could perform beginning on April 20, 2011. R. 91. However, the ALJ found that considering Tighe's age, education, work experience and RFC, there were jobs that the he could have performed prior to April 20, 2011. R. 90. In reaching this conclusion, the ALJ considered the testimony of the VE that a person with Tighe's age, education, work experience and RFC would have been able to perform unskilled light occupations such as a cutter, a gluer or a light housekeeper. R. 91. The ALJ also considered Tighe's testimony that his physical condition is progressive and that his mental impairments had deteriorated over time. R. 88-89. The ALJ, however, found Tighe's statements regarding the intensity, persistence and limiting effects of his medical impairments not credible prior to April 20, 2011, to the extent that they were not compatible with the ALJ's RFC assessment. R. 85-86. Further, the ALJ considered the general lack of medical evidence in the

record between the claimants's alleged onset date, March 1, 2007, until April 20, 2011. R. 87. For example, the ALJ noted that although the record did reflect a history of bilateral shoulder capsulitis, the record also showed long treatment gaps until April 20, 2011, which suggested that Tighe had retained a certain degree of functioning until that time. R. 85-86.

With regard to Tighe's mental impairments, the ALJ noted that the record confirmed a history of depression and chronic anxiety, including evidence of sleeplessness, low energy and mood swings. R. 86. However, the ALJ also noted evidence in the record that Tighe's depression and anxiety was improving in the spring of 2010. R. 86-87. For example, Tighe reported "coming to terms" with his job loss. R. 87. In April 2010, Tighe was feeling more optimistic and was thinking about getting a job, and in subsequent months, Tighe reported that he was getting "better." Id. However, in June 2011, Tighe returned to therapy and reported increasing anxiety, anger and difficulty concentrating. Id. Moreover, in August 2011, Tighe was hospitalized for ten days due to severe depression and anxiety. Id. Overall, the ALJ found that, although the record reflected some psychological impairments prior to June 2011, Tighe's depression and anxiety worsened at that time. Id. at 88-89. Nevertheless, the ALJ noted that Tighe's shoulder impairments were disabling two months earlier in April 2011. Id. at 87. Therefore, the ALJ determined that Tighe was not disabled prior to April 20, 2011, but became disabled on that date and has remained disabled. Id. Tighe contests these findings as to the onset date of disability.

### D. Tighe's Challenges to the ALJ Findings

Tighe asserts that the ALJ erred in choosing a disability onset date of April 20, 2011, on the grounds that "this finding contains numerous internal inconsistencies and is not compatible with the objective evidence." D. 11 at 4. Tighe seeks reversal of the ALJ's decision only as to

the onset date, or in the alternative, for the Court to remand for further proceedings on the ALJ's findings that were unfavorable to him. Id. at 8. For the reasons discussed below, the Court denies this request.

*1.  Shoulder Impairments*

First, Tighe argues that the ALJ's chosen onset date was inconsistent with the record because the "only piece of objective evidence that corresponds to the established onset date of April 20, 2011, is a visit to the orthopedic surgeon, Eric Holstein, MD." D. 11 at 5-6.

"The onset date of disability is the first day an individual is disabled" pursuant to Social Security law. Social Security Ruling ("SSR") 83-20, 1983 WL 31249, at *1 (1983). "Factors relevant to the determination of disability onset include the individual's allegation, the work history, and the medical evidence." Id. While "[t]hese factors are often evaluated together to arrive at the onset date . . . the individual's allegation or the date of work stoppage is significant in determining onset only if it is consistent with the severity of the condition(s) shown by the medical evidence." Id. "In disabilities of nontraumatic origin, the determination of onset involves consideration of the applicant's allegations, work history, if any, and the medical and other evidence concerning impairment severity. The weight to be given any of the relevant evidence depends on the individual case." Id. at 2. However, "the established onset date must be fixed based on the facts and can never be inconsistent with the medical evidence of record." Id. at 3.

Here, there is substantial evidence in the record that supports the ALJ's chosen onset date as to Tighe's physical impairments. The ALJ reasonably concluded that while Tighe sought treatment for shoulder issues in the past, the medical records and other evidence did not reflect a disabling condition until Dr. Holstein considered his shoulder motion "severely limited" on April

14

20, 2011. R. 475. Most notably, the records reflects that the last time in 2008 that Tighe sought medical attention for his shoulder, Dr. Holstein noted that his shoulder condition had improved and suggested using over-the-counter pain medication and to continue exercise. R. 314. Dr. Holstein also noted that Tighe was able to do physical activities and had recently finishing working on a porch. Id. The medical records reflect that Tighe skipped his next scheduling appointment and did not seek any further treatment for his shoulder until March 28, 2011, when he visited Dr. Epstein for a consultative examination. See R. 427; Rivera v. Comm'r of Soc. Sec., 2000 WL 1022891, at *1 (1st Cir. 2000) (unpublished) (considering the fact that the "record show[ed] that [claimant's] symptoms were initially sporadic in the first year of alleged disability, [and] she sought no treatment for the next three years" in affirming ALJ's finding of no impairment); Irlanda Ortiz v. Sec'y of Health & Human Servs., 955 F.2d 765, 770 (1st Cir. 1991) (considering "lack of any evidence of sustained treatment" in affirming ALJ's determination that claimant was not disabled); Smolinsky v. U.S. Soc. Sec. Admin., Com'r, No. 08-CV-210JD, 2009 WL 1321907, at *10 (D.N.H. May 12, 2009) (concluding that "claimant's decision not to seek treatment for any length of time further undermines the alleged severity of his mental health disability"). While Dr. Epstein, who saw Tighe during that March 2011 visit only for a consult, noted in his report that Tighe had a "very limited range of motion of both shoulders after trauma," and "mild diffuse pain," R. 428, it was not until April 20, 2011 that a treating physician, Dr. Holstein, examined Tighe and concluded that his shoulders had "severely limited active and passive range of motion." R. 475. Further, x-ray results showed an osteophyte formation on his left humerus. R. 476. Dr. Holstein prescribed Tighe with Clinoril and referred him to physical therapy. Id. The Court concludes that there is substantial evidence

15

in the record to support the ALJ's onset date of April 20, 2011 in regard to Tighe's shoulder impairments.

The Court further notes that the only purportedly contrary evidence to which Tighe directs the Court is the ALJ's RFC assessment – Tighe asserts that because the ALJ determined that Tighe was restricted to no overhead reaching both before and after April 20, 2011, the "ALJ's assertion that the Plaintiff's shoulder impairments became disabling on April 20, 2011, is not reflected in her RFC assessments." D. 11 at 6. While the ALJ concludes in the RFC findings that Tighe was able to perform light work and could not perform bilateral overhead reaching both before and after April 20, 2011, these findings do not render the chosen onset date erroneous. Here, regardless of the RFC findings, the ALJ was required to assess whether Tighe's RFC, education, work experience and age rendered him unable to do any work. 20 C.F.R. § 416.920. The ALJ conducted this analysis and concluded that based on these factors and the VE's testimony, Tighe was able to perform unskilled light work prior to April 20, 2011 and no work after April 20, 2011. D. 91. Further, there is also no indication that Tighe's inability to perform "overhead reaching with the upper extremities bilaterally" would mean he could not perform "light work."

For these reasons, the Court concludes that substantial evidence supports the ALJ's onset date of April 20, 2011 for Tighe's shoulder impairments.

   2.   *Mental Impairments*

The Court also rejects Tighe's argument that the ALJ's finding of April 20, 2011 as the onset of his disability was not supported by substantial evidence.[3] D. 11 at 7.

---

[3]The Court notes that while the ALJ's actual chosen onset date for Tighe's mental impairments was June 2011, the ALJ gave Tighe the benefit of the earlier onset date of April 20, 2011 to coincide with the onset date of his physical impairments. R. 87.

16

First, the lesser weight the ALJ placed upon the opinion of Gingras and Dr. Dancel was not improper. Tighe's treating psychotherapist, Gingras, wrote in a June 27, 2011 letter that Tighe "became totally disabled prior to December 31, 2009." R. 477. However, Gingras was not an acceptable medical source under the application regulations and, accordingly, the ALJ was not required to evaluate it under 20 C.F.R. §§ 404.1527(a)(2) and 416.927 or give it controlling weight.

In a similar vein, the opinion of Dr. Dancel, Tighe's treating physician, as to the onset date of his mental impairment was not entitled to controlling weight. In an April 6, 2012 "Attending Physician's Statement of Disability" form, Dr. Dancel indicated Tighe was "totally disabled from gainful employment" as of June 2009. R. 493. However, "[c]ontrolling weight is not accorded to a physician's opinion that the claimant is disabled because that is a determination reserved to the Commissioner." Hooke v. Colvin, No. 13-11557-JLT, 2014 WL 2025161, at *6 (D. Mass. May 16, 2014); SSR 96-5p, 1996 WL 374183, at *1 (noting that "medical source opinions on issues reserved to the Commissioner," including whether a person is disabled under the Social Security Act, are not given "controlling weight or special significance").

Moreover, there was substantial evidence in the record to support the ALJ's conclusion that Gingras' and Dr. Dancel's opinions regarding the onset date were inconsistent with other evidence in the record. Despite Gingras' opinion in a June 27, 2011 letter about onset prior to the end of December 2009, the various progress notes do not reflect significant impairment of mental functioning. See, e.g., R. 321 (on February 9, 2010, noting depression, but engagement about finding employment); R. 321 (on June 8, 2010, noting that feelings of anxiety had significantly diminished and Tighe planned work on mother's house and looking for a job in the fall); R. 322 (on August 27, 2010, reporting that Tighe felt demoralized, but had been exercising

17

and had lost forty pounds); R. 323, 710 (on various dates November 2010, reporting ongoing aggravation with others, but then appearing calmer and was engaged in helping his mother who recently had surgery and his brother who needs to visit several doctors). On this record, the ALJ had substantial evidence to determine that the onset date declared by Gingras was not consistent with the record.

The same is true as to Dr. Dancel's opinion that the onset date was in June 2009. This opinion was not consistent with the other evidence in the record. Although Tighe was reporting feelings of anxiety in June 2009, he reported feeling better. R. 369. As of the end of 2009, December 15, 2009, Dr. Dancel observed that Tighe's mood was stable. R. 365. Into the next year, Dr. Dancel reported at various times that Tighe was anxious, but not excessively so and that his mood was stable. R. 324-28. Moreover, Dr. Dancel's opinion about the onset date of his "total disability" provided no information about Tighe's specific functional limitations, R. 88, 493, which was another rational basis for the ALJ to consider in discounting his opinion. See 20 C.F.R. §§ 404.1527(c)(3), 416.927(c)(3).

Mason v. Apfel, 2 F. Supp. 2d 142, 149 (D. Mass. 1998), cited by Tighe, does not compel another result. In that case, the ALJ had, "rather than determining whether [the claimant's] alleged date of onsets consistent with the evidence of the record," concluded that it was "*not possible*" to infer the onset date from the medical evidence of a doctor in the record. Id. (emphasis in original). Given that circumstance, the Court ordered "[w]here, as SSR 83–20 directs, the onset date must be inferred from the medical and other evidence describing the history and symptomatology of the disease process, the administrative law judge is required to retain the assistance of a medical advisor." Mason, 2 F. Supp. 2d at 150. Such is not the case here where the ALJ did not conclude that the onset date could not be determined, but that the

opinion of certain sources about that onset date were not consistent with the evidence and the ALJ determined an onset date of April 20, 2011 after weighing and consideration of the record in its entirety.

Moreover, the erroneous reference to "August 10, 2010" and "April 10, 2010" in the ALJ's decision, R. 88, 89, do not create any ambiguity about the onset date. The Court agrees that these are appropriately characterized as "scrivener's errors," D. 13 at 18, particularly where, throughout the decision, the ALJ otherwise consistently refers to "April 20, 2011" and "April 2011" as the onset date. See generally R. 79-92. That is, reviewing the decision as a whole, there is no reasonable question that the ALJ determined that the onset date of disability was April 20, 2011. See, e.g., R. 81 (citing to "the established onset date of disability, April 20, 2011").

## V.    Conclusion

For these reasons, the Court DENIES Tighe's motion for partial reversal and remand, D. 11, and ALLOWS the Commissioner's motion to affirm, D. 12.

**So ordered.**

/s/ Denise J. Casper
United States District Judge